[Civ. No. 20583. Second Dist., Div. Three. June 14, 1955.]

JASPER ERNEST LAIL, as Executor, etc., Respondent, v. ROBERT L. LAIL et al., Appellants.

J. Robert Maddox and William J. Clark for Appellants.

W. Floyd Cobb for Respondent.

VALLÉE, J.—Appeal by defendants from a judgment for plaintiff as executor of the will of Jasper E. Lail, Sr., deceased, in an action for alleged breach of trust and for money had and received. Defendants also appeal from the order denying their motion for a new trial. That order is not appealable, and the appeal therefrom will be dismissed. Defendant Pearl A. Lail is the wife of defendant Robert L. Lail. Defendant Robert L. Lail will be referred to as defendant.

Jasper E. Lail, Sr., died in Beverly Hills on April 17, 1950. He was about 90 years of age. At the time of his death, his wife was 80 years of age. The decedent and his wife had five children living at the time of his death— four sons and one daughter. Defendant is the eldest. Plaintiff is his brother.

Decedent lived on a ranch in Texas until 1930. The ranch consisted of 2,960 acres. Included in the 2,960 acres is a section known as section 151. Section 151 was purchased during the years 1910 to 1913 under a contract of sale. Defendant was not living at his father's home at the time. Defendant testified that sometime in 1909 he received a letter from his mother stating his father had an opportunity to buy a section of land which he had theretofore leased, his father did not have the money to pay for it, and asked if defendant would pay half, if he would make the first payment his father would make the next, and they would buy it together; he wrote back and "told them to go ahead and make the deal and let me know how much the amount was to be paid and I would have the money to pay it"; he sent the money to make the first payment which was about $400 (it was $416); the other payments were "somewhere in the neighborhood of $400 or a little better" (they were four payments of $416 each with 6 per cent interest); he paid half the purchase price by sending checks and money to his father in Texas; he does not remember the exact amount of the purchase price—it was somewhere around $1,800 or $1,900; part of the money was sent in cash and part by check; he does not remember exactly how much money he sent; his "mother kept track of all I sent." Title to section 151 was taken in the name of decedent.

In 1930 defendant induced decedent to sell his cattle and horses, lease the Texas ranch, and move to California. Since 1930 the 2,960 acres have been subject to a lease for grazing. The first grazing lease was negotiated by decedent. Thereafter all grazing leases were made by decedent with the advice of defendant. From 1930 until the death of decedent, defendant helped and advised decedent in every transaction in which decedent engaged. In caring for his business and affairs, decedent gave defendant checks signed in blank and defendant filled them in and paid the bills. Decedent obtained cash by giving defendant checks signed in blank which defendant filled in, cashed, and gave the cash to decedent. Defendant never demanded or received any compensation for the services so rendered. For many years prior to and up to the time of his death, decedent had a commercial account in Winters State Bank in Winters, Texas.

On June 6, 1936, decedent executed a witnessed last will and testament which contained this provision:

"To my oldest son, R. L. Lail, [defendant] I give, devise, and bequeath the North One-Half of Section No. 151, Block No. 64, of the H & T. C. Ry. Co. surveys of Taylor County, Texas, in fee simple, because in reality he owns the property and the title of same merely in my name in trust for my use during my life."

In February 1948 defendant negotiated an oil and gas lease on 649.1 acres of land described as section 160 belonging to decedent, from which a bonus check of $2,921.58 was received. On receipt of the check, decedent endorsed it, and a joint tenancy savings account, Number 1154, was opened in Bank of America, Wilshire and La Brea Branch, Los Angeles. Decedent, defendant, and sometime later defendant's wife, signed the signature card. The signature card provided that any one of them could withdraw funds from the account. Defendant's wife did not withdraw any of the funds.

In November 1949 defendant negotiated another oil and gas lease which covered section 151 and other parts of the Texas ranch. Prior to December 18th defendant received a bank draft of $10,560 payable to decedent as a bonus for the lease. Decedent endorsed the draft and it was deposited in the Bank of America joint tenancy savings account. The bonus was at the rate of $9.00 an acre. There was testimony that decedent told defendant to deposit the draft in the Winters State Bank account.

On December 18, 1949, in the afternoon, a meeting was had

at decedent's home at which decedent, his wife, all of the children, and some of the sons' wives were present. There was evidence that the purpose of the meeting was to have the children sign something stating the parents did not "owe anybody any money whatever." Conversation was had about the oil bonus money. Defendant said he had received the oil bonus check and that it was for $10,560. Defendant stated he felt he was entitled to part of the revenue from section 151, to which one of the brothers replied, "That's a deal between you and my father, and whatever my father agrees to is perfectly all right with me." Defendant was shown a typewritten document which read that decedent and his wife were not indebted to any of the children in any amount. Decedent and his wife signed the original; defendant's brothers and sister signed the original and 4 copies of the instrument; defendant did not sign. The document was received in evidence without objection.[1] The wife of one of the brothers testified that at the request of her mother-in-law she took a typewriter to decedent's home in the morning of December 18th and typed the statement.

On January 6, 1950, decedent signed two checks and gave them to defendant. The first check reads:

"16-146   Wilshire-La Brea Branch   16-146

BANK OF AMERICA   No. 2

National Trust and Savings Association

Los Angeles, Calif., Jan 6 1950

Pay to the
Order of _____ R. L. Lail _____ $3380.00

Three Thousand Three Hundred Eighty and 00/100 Dollars

account #1154

J. E. Lail"

---

[1]The document reads:

"This agreement, entered into this 18th day of December, 1949, by and between J. E. Lail and Sara Frances Lail, his wife, party of the first part, and their children, named as following:
R. L. Lail
Jessie S. Hankla
P. F. Lail
Ernest Lail
John O. Lail
known hereafter in this agreement, as parties of the second part.

"Witnesseth: That whereas under this agreement J. E. Lail and Sara Frances Lail, his wife, as first parties, do not owe any debts or obigations [sic], in any way, shape, form or fashion to the said R. L. Lail, Jessie S. Hankla, P. F. Lail, Enrest [sic] Lail and John O. Lail, second parties,

On the reverse side, there appears the following:

"Grazing Lease on 320 acres of
Section 151 Taylor Co., Texas

| | |
|---|---|
| 20 yrs @ 65¢ Per acre | $4160<u>00</u> |
| Dec 1-1949 To June 1-1950 @ 75¢ Per acre | 120.00 |
| | $4280.00 |
| Less Taxes (20 yrs) | – 400.00 |
| " 1 Mile fence | – 500.00 |
| Balance | $3380.00 |

R. L. Lail [Signed]"

The check is perforated "PAID 1-21-50." The second check reads:

"16-146   Wilshire-La Brea Branch   16-146
BANK OF AMERICA                    No. 3

National   Trust and Savings   Association

Los Angeles, Calif., Jan 6 1950

Pay to the
Order of            R. L. Lail              $288000

Two Thousand Eight Hundred Eighty and 00/100 Dollars

account #1154

J. E. Lail"

On the reverse side, there appears the following:

"Oil Bonus on 320 acres of
Section 151 Taylor Co., Texas
320 acres @ $9.00 Per acre        $288000
R. L. Lail [Signed]"

This check is also perforated "PAID 1-21-50." All of the handwriting on the two checks, except the signatures, is that of defendant. It will be noted that the checks are drawn on a commercial account. Decedent did not have a commercial account in Bank of America. The checks total $6,260. This

hereto as second party. The first partyies [sic] are free from all obligations, to the parties of the second party, Any and all expenditures, by either member of the second party, have been reimbursed, in cash, or by check, by J. E. Lail and Sara Frances Lail, his wife, party of the first part.

"In witness whereof the parties have executed this indenture the day and year hereinafter mentioned."

amount was debited to the savings account by Bank of America on January 21, 1950 and paid to defendant.

Defendant testified with respect to the receipt of the two checks that he dropped in to see his parents, and at the suggestion of his mother that his dad "settle up with me" his father and he figured out how much was coming to him from section 151; he wrote out the two checks so they would have a definite record between the oil lease and the grass lease; his father signed them after they had been filled out; when he made the first deposit in the joint tenancy savings account he "just picked up a little check book and I brought the deposit slip back and the book and I handed them all to my father"; that is how the checks happened to be written on a commercial account; his father said "he wanted it all paid before he passed away or anything happened to him"; the grazing lease "ranged from $1 down to 52 cents an acre"; and they agreed on 65 cents an acre less taxes and cost of erecting a fence.

Plaintiff brought the action to recover the $6,260 on the theory that defendant was trustee thereof and that it is a part of the estate of decedent. The court found that defendant R. L. Lail appropriated the $6,260 to the use of defendants. Judgment was for plaintiff, as prayed.

Defendant first asserts that the money in the joint tenancy account from which the $6,260 was withdrawn belonged to his father and himself jointly. The argument is that defendant contributed half the purchase price of section 151, that title was taken in the name of his father, and that the money in the joint tenancy account was income from section 151. The difficulty with the argument is that it assumes that defendant contributed half the purchase price. The only evidence in that regard was the testimony of defendant. Obviously the court did not believe the testimony and we cannot assume its veracity. (See *G. R. Holcomb Estate Co.* v. *Burke,* 4 Cal.2d 289, 299 [48 P.2d 669]; *McQuin* v. *Rice,* 88 Cal.App.2d 914, 917-918 [199 P.2d 742].)

It is next asserted that in the absence of fraud or undue influence, the signature cards are conclusive evidence of a joint tenancy. Defendant testified that neither he nor his wife deposited any money in the account and that he never did and does not now claim any interest in the funds in the account. He relies on section 15a of the Bank Act, as it in part read at the time in question:

"The making of the deposit in such form [joint tenancy]

shall, in the absence of fraud or undue influence, be conclusive evidence, in any action or proceeding to which either such bank or the surviving depositor or depositors may be a party, of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors.[2]''

The court found that all moneys deposited in the joint tenancy account and all moneys withdrawn therefrom belonged to the decedent, and that all the moneys therein were not property belonging jointly to the decedent and defendants; that the account was opened only for the purpose of facilitating the payment of bills incurred by the decedent and for his convenience in paying such bills. Defendant does not challenge the finding. The moneys plaintiff seeks to recover are not moneys on deposit in the joint tenancy account. They are moneys which were withdrawn by defendant during the lifetime of the decedent.

Section 15a set up two presumptions: First, a rebuttable presumption that a deposit in the names of the depositor and another person ''in form to be paid to'' either or the survivor of them becomes the property of such persons as joint tenants. Second, a conclusive presumption that in the absence of fraud or undue influence, it was the intention of the depositors to vest title in the survivor. ■ The conclusive presumption applies only in favor of the survivor to moneys still remaining in the account at the time of death. It does not apply to moneys withdrawn by either of the depositors during life, even if one of them has subsequently died. (*Paterson* v. *Comastri,* 39 Cal.2d 66, 71 [244 P.2d 902].) ■ The presumption of equality of interest arising from the form of the joint account is rebuttable by competent evidence showing the true character and ownership of the moneys deposited. (Id.) The evidence was sufficient to rebut the presumption.

Defendant contends the evidence was insufficient to establish that he appropriated $6,260 belonging to the decedent to his own use. He concedes that the decedent reposed great trust and confidence in him. Civil Code, section 2235, provides: ''All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence

[2] The quoted provision appears to have been omitted when the Banking Code became a part of the Financial Code in 1951. (Stats. 1951, ch. 364, p. 860; Fin. Code, § 852.)

acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence.'' Civil Code, section 2219, provides that everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee. ■ To bring the presumptions of insufficient consideration and of undue influence into operation, it is necessary to show that a confidential relationship existed and that this relationship was used by the fiduciary to gain an advantage. ■ ''When a fiduciary enters into a transaction with a beneficiary whereby the fiduciary's position is improved, or he obtains a favorable opportunity, or where he otherwise gains, benefits, or profits, it may fairly be said that an advantage has been obtained. ■ To declare that the advantage obtained must be shown to be unfair, unjust, or inequitable before the presumptions arise would result in the imposition of a condition which is not required by section 2235.'' (*Bradner* v. *Vasquez*, 43 Cal.2d 147, 152 [272 P.2d 11].) ■ The presumption of undue influence is evidence and it is sufficient to sustain the judgment although there may be direct evidence to the contrary of the presumption. (Id., 153.) There was evidence tending to show there was no undue influence; but we cannot say, as a matter of law, that the presumption of undue influence was overcome by such evidence.

The claim is made that the court erred in not finding that the decedent held a half interest in section 151 in trust for defendant. It is argued that had the court so found, a different result would have been likely since at least a part of the $6,260 was oil bonus from section 151. The contention that the decedent held a half interest in section 151 in trust for defendant is predicated on the 1936 will. As a special defense defendant alleged that on January 6, 1950, he was the owner and entitled to the possession of certain property in Texas; that on that date and for a long time prior thereto the decedent was possessed of the property, and during that period had received and enjoyed the rents, issues, and profits therefrom; and that the decedent paid defendant the $6,260 as payment in full for such use and occupation to and including June 1, 1950. Defendant says he established the allegation of ownership by the will of 1936. Assuming that the will would have established that the decedent held a half interest in section 151 in trust for defendant, it was not offered or received in evidence and cannot be considered by us for that purpose.

The record as to what took place at the time the will of 1936 was offered and received in evidence is set out in the margin.[3] Counsel first offered the document with the exception of the last line in the second paragraph, which reads: "and the title of same merely in my name in trust for use during my life." Further foundation was laid and the court stated the will would be received "for the limited purpose only of showing a state of mind." Counsel for defendant then said: "For that purpose only it is offered." ▆ Having acquiesced in the ruling, defendant cannot on review assert that the will was admitted for all purposes. · (4 Cal.Jur.2d 424, § 558.) The will having been offered and received for the sole purpose of showing the state of mind of the decedent, it cannot be

[3]"Q. [By Mr. Maddox, attorney for defendant] I hand you Defendants' Exhibit L for identification [the will of 1936] only and ask you if you have ever seen the original of that document? A. Yes, I have.

"Q. Did you see the original at that time and place in Texas? A. The first I saw that.

"Q. Mr. Lail, do you understand my question? Did you see the original when you were down in Texas at the trial, the original will? A. Yes.

"Q. What, if anything, happened to that original will at that time and place? A. As far as I know, it is held in Abilene court.

"Q. It was read to the jury, was it not? A. Yes.

"Q. It was introduced into evidence, was it not? A. Yes.

"MR. MADDOX: If the Court please, at this time I would like to offer this document as Defendants' next in order with the exception of the last line on Paragraph Second. That is not offered.

"MR. COBB: Your Honor, the plaintiff objects to that on the grounds that it purports to be a last will and testament. There is no proper foundation laid. There is nothing to show that the will was ever admitted to probate or approved as the last will, and there is no proper foundation laid as to the execution of the instrument, and on the further ground that it would be hearsay and incompetent and irrelevant and immaterial as to the issues in this case.

"THE COURT: Let me ask the witness a question or two. Did the document to which you have referred, the original of this, bear the signature of your father?

"THE WITNESS: It does.

"THE COURT: You knew it to be his signature, did you?

"THE WITNESS: Yes.

"THE COURT: Would this be a correct statement, that to the best of your knowledge and belief the original of this document is not within the State of California at the present time?

"THE WITNESS: I don't think it is.

"THE COURT: Well, so far as you know.

"THE WITNESS: As far as I know, that is right.

"THE COURT: The document will be received for a limited purpose. However, I cannot eliminate part of it as Mr. Maddox suggested. I will either have to receive the whole document or none of it. Counsel, if you want to offer the entire document, it will be received for the limited purpose only of showing a state of mind.

"MR. MADDOX: For that purpose only it is offered. Thank you.

"THE COURT: It will be received as Exhibit L."

620

considered for any other purpose. The state of mind for which the court said the will was received was to show a friendly mental attitude of the decedent toward defendant. It was not for the purpose of showing the state of mind of a trustee toward the beneficiary of a trust or a state of mind in which the decedent acknowledged a trust relation with respect to a half interest in section 151. On the record it cannot be held that the will of 1936 was received in evidence for the purpose of establishing that the decedent held a half interest in section 151 in trust for defendant. There was no evidence to support the allegations of the special defense except the testimony of the defendant with respect to contributions to the purchase price of section 151, which the court did not believe.

Defendant complains of various rulings of the court with respect to the reception and rejection of evidence. All are trivial with the exception of one which was pressed on us with emphasis at the oral argument. Mary Arnold Lail, the wife of P. F. Lail, a brother of plaintiff and of defendant, was called as a witness by defendant. On direct she testified she prepared the document of December 18, 1949, in which it was stated that the parents did not "owe anybody any money whatever"; she took a typewriter to her father-in-law's home; her father-in-law and mother-in-law told her "what they wanted to put in the agreement." On cross the following occurred: "Q. By Mr. Cobb [attorney for plaintiff] : And did someone call you to come there to the residence? A. They did. Q. Who called you? A. My mother-in-law. Q. What did she tell you? Mr. Maddox: Objected to as hearsay. The Court: Overruled. The Witness: She said that she would like me to draw up an agreeemnt whereby they didn't owe any of the children any money. Q. By Mr. Cobb: And what did you tell her? A. I told her I would. Q. And what did you do in reference to that? A. I went over to her house and sat down by them and they told me what they wanted written in this agreement. Q. Was Mr. J. E. Lail present? A. He was. Q. And what did they say to you at that time? Mr. Maddox: If the court please, I would like to have a running objection on the ground it is outside the presence of either one of the defendants. The Court: Overruled, counsel. A. Dad told me, 'I want you to write a letter stateing [sic] that I do not owe any ot [sic] the children any money in any way, form or shape or fashion, any debts or obligations.' He said, 'I have reinbursed [sic] the children all the money they may have spent or any expenditures by cash or by check,

and I do not owe any of them any money in any way.' I wrote that down just like he stated it to me. Q. And what did you do with it after you wrote it? A. I left it there with my mother in law.'' ■ Defendant says it was prejudicial error to permit the witness to testify to what her mother-in-law and father-in-law said to her out of the presence of defendant. The rulings were of course erroneous. The witness had not testified on direct to any conversation out of the presence of defendant. The evidence was not admissible; it was hearsay. We think, however, it was not prejudicial. The substance of what the mother-in-law and father-in-law said to the witness was recited in the document of December 18, 1949, which was admitted in evidence without objection. That document, signed by the mother-in-law and by the father-in-law, said they were free from all obligations to the children and that ''Any and all expenditures'' by any of the children had been reimbursed in cash or by check by the parents.

No other points require discussion. ■ The record is replete with incompetent, irrelevant, and hearsay evidence admitted without objection of defendant. But having been received without objection, it is sufficient to support the findings. (*Estate of Pohlmann,* 89 Cal.App.2d 563, 574 [201 P.2d 446].) There is much evidence that would have supported contrary findings. We may not reject the findings of the trial court and substitute findings of our own, even though we might arrive at a different conclusion.

The appeal from the order is dismissed. The judgment is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied July 6, 1955, and appellants' petition for a hearing by the Supreme Court was denied August 11, 1955.