[Civ. No. 21532.   Second Dist., Div. Two.   Oct. 17, 1956.]

HENRY BIESCAR, JR., et al., Plaintiffs and Respondents, v. CZECHOSLOVAK-PATRONAT (a Corporation), Appellant; MARY HENRIETTA JOSEPHINE BIESCAR WALDNER et al., Defendants and Respondents.

134

L. J. Styskal, Alvin O. Wiese, Jr., and Charles F. Lowy for Appellant.

Hunt & McCann, Arnerich, Del Valle & Sinatra for Respondents.

FOX, J.—This is an appeal by the Czechoslovak-Patronat (hereinafter designated Patronat) from a judgment quieting title to real property in favor of plaintiffs and certain cross-complainants.

The plaintiffs who originally filed the within action for declaratory relief and to quiet title are heirs of Henry and Josephine Biescar, the grantors of the property here in dispute. Named as defendants were the Patronat and other heirs of the grantors. The defendant heirs, in turn, cross-complained against the Patronat, raising the same issues made in the complaint. The Patronat has also filed its own cross-complaint against all the heirs praying that title be quieted in its favor. Despite the multiplicity of pleadings, the parties are in accord that the issues are essentially those framed by the complaint, the answer and cross-complaint filed by the Patronat, and the answer of the cross-complainants.

The paramount issues presented by this appeal are (1) whether the original grant created a fee simple subject to a condition subsequent or merely a covenant as to use by the grantees; (2) whether the interpretation of the instrument by the court was contrary to the rule of construction against conditions leading to forfeitures if that is reasonably possible; and (3) whether the court erred in failing to relieve against a forfeiture by virtue of the changed character of the neighborhood.

The background facts are these: The Patronat is a nonprofit corporation and functions as a coordinating organization or congress for various fraternal clubs and lodges comprising persons of Czech or Slovak origin in Los Angeles and its environs. The Patronat's membership is made up of delegates from these affiliated groups and its primary objective is apparently to promote and foster a program of social, cultural and recreational activity for local residents of Czechoslovakian descent. As a part of its program in the early thirties, the Patronat was desirous of establishing a communal meeting place where the functions it sponsored for its compatriots might be held.

Henry and Josephine Biescar, a married couple, were members of several Slovak organizations. They owned a parcel of land in the area now known as La Crescenta. They were willing to donate a part of this land to the Patronat as a meeting ground for fellow Czechoslovakians. On November 6, 1931, the Biescars conveyed to the Patronat a triangular-shaped segment of this property, located at one corner of their tract. The deed, which was recorded within a week, was a grant of a fee simple estate in absolute form. The Patronat gave no monetary consideration for the conveyance. However, contemporaneously with this deed, the Biescars and the Patronat executed a document entitled "Agreement" appertaining to the property so granted. This instrument was not recorded until 1949. It was drafted by L. J. Styskal, the attorney for the Patronat. So far as it is here germane, this document (in which the Biescars are designated "First Parties" and the Patronat "Second Party") reads as follows:

"WHEREAS, THE CZECHOSLOVAK-PATRONAT is an organization calculated and planned for the purpose of uniting the Czecho-Slovak people of Los Angeles and vicinity into a civic, patriotic and mutually beneficial unit, and pursuant to such plan or scheme, said organization is in existence; and

"WHEREAS, HENRY BIESCAR and JOSEPHINE BIESCAR, as members of the said Czecho-Slovak colony, are desirous to grant unto THE CZECHOSLOVAK-PATRONAT, for its use and for the benefit of its constituting members, and to that extent to the Czecho-Slovak community of Los Angeles and vicinity, certain property hereinafter more specifically described, for purposes hereinafter more accurately denominated; and

"WHEREAS, THE CZECHOSLOVAK-PATRONAT is willing to accept the said property *on the conditions hereinafter more specifically enumerated,* and for the purposes designated;

"Now, THEREFORE, IT IS AGREED, UNDERSTOOD AND CONTRACTED as follows, to-wit:

"FIRST: First parties hereby agree to grant by deed to be executed contemporaneously herewith, unto second party herein, that certain property situated in the County of Los Angeles, State of California, and particularly decribed as follows, to-wit: [Property described.]

.    .    .    .    .    .    .    .    .    .    .    .    .

"SECOND: The said grant and devise shall be subject to the following provisions, to-wit:

"(a) [1]The said property shall be used and dedicated by second party herein as a park or meeting ground for the CzechoSlovak people in Los Angeles and vicinity, and their various organizations, clubs and lodges; the said property shall remain under the control and direction of the said Czechoslovak-Patronat, but its use shall, nevertheless, be administered equally and fairly to all persons and organizations mentioned and with a view of enabling as many of said persons to have the benefits and uses of said property as possible.

"(b) It is agreed and understood that the said property shall be designated and known as "BIESCAR PARK" and shall be so designated in all public references thereto, to the end that the CzechoSlovak public shall become acquainted with said property and its location under said name.

---

[1][Typed in margin.]

It is understood that paragraph (a) means that whenever the Czechoslovak Patronat shall rent or lease the premises to any individual, organization or club for private entertainment, they shall restrict attendance to exclude the general public; that this shall be a private park, and not a public park.

HENRY BIESCAR
JAMES TYRA PRETSEDA

"(c) [2]It is agreed and understood and *made a condition of this grant* that the said property shall not be encumbered by the second party herein or any of its successors or assigns for a period of twenty-five (25) years from the date of the transfer thereof unto second party herein, *it being the intent to perpetuate said property in a free and clear condition as a meeting place and recreational center, as hereinabove more particularly set forth.*

"(d) [3]First parties agree to sell unto second party, at such rates and upon such terms as shall be hereafter determined by these parties, five (5) shares of stock in the Water District now supplying the area and vicinity of the property agreed to be conveyed, such shares of stock to be sold at a price of Fifty Dollars ($50.00) each. It is the intent of this provision that the purchase of said shares of stock *shall be a condition of the transfer, for the reason that first parties herein propose and intend that the said "BIESCAR PARK" shall be amply supplied with necessary water for the uses to which it shall be dedicated.*

. . . . . . . . . . . . .

"THIRD: It is specifically agreed *that all of the conditions above set forth* shall be borne out and performed by second party herein, in the spirit of the donation made by first parties and *to perpetuate the said property at all times for the general good of the CzechoSlovak public . . ."* (Italics added.)

At the time the property was conveyed, it was worth between $600 and $800, and consisted of rocky land located in a relatively undeveloped area which was zoned exclusively for residential purposes. On July 31, 1933, about 20 months after the gift deed was made, the Board of Supervisors adopted Ordinance Number 2305, the effect of which was to exempt the property donated by the Biescars from its restriction to residential uses. The ordinance specifically permitted the

---

[2][Typed in margin.]

Provisions of subparagraph (c) of paragraph SECOND are partially waived for the following purposes only: That said property may be hypothecated to Great Western Building and Loan Association as security for a building loan in the sum of $ . . . . . . . . . . . , the full amount of which shall be used to erect a building on said premises, designated as a meeting place of Czechoslovak people.

DATED: October . . . . . . , 1933.

HENRY BIESCAR
JOSEPHINE BIESCAR

[3][Typed in margin.]

See partial waiver of this paragraph set forth on previous page.

use of the property "For the construction and maintenance of a clubhouse for the Czechoslovak-Patronat." Members of the Patronat proceeded to clear the land of rocks and bushes by voluntary labor. Thereafter a clubhouse was erected on the land by the Patronat and dedicated by the Consul of Czechoslovakia in a formal ceremony which the Biescars attended.

During the next 17 years, the Patronat used the property for recreational and cultural activities for the benefit of the ethnic groups affiliated with it. With the passage of time, the surrounding area was gradually built up with residential buildings. The character of use to which the property was put in the course of meetings and activities, and the incidental problems created, encountered objection on the part of residents of the neighborhood. This situation led to hearings before the Zoning Board of the Los Angeles Regional Planning Commission. John P. Commons, who sat as a member of the hearing body, testified as to the nature of the complaints by residents of the neighborhood at the hearing.[4] The complainants testified that persons attending meetings drank alcoholic beverages on the premises and became intoxicated, that beer bottles and cans were strewn on the streets and littered their yards, that invitees used the street and parking areas for urination, that adjoining streets were congested with parked cars, that crowds in excess of the capacity of the building and grounds to contain them attended certain meetings, that the general public was solicited to use the facilities of the park by radio advertisements and that non-Czechoslovakian organizations were using the premises, that certain functions on weekday nights lasted far into the early morning hours with much attendant noise, and that the Patronat piled boxes and containers outside its building in an unsightly manner.

As a result of these hearings, the zoning board made certain recommendations which were adopted by the planning commission and, in turn, recommended to the board of supervisors. The Patronat was notified by the county regional planning commission that it would recommend that the board of supervisors revoke the exception granted by Ordinance 2305 unless the Patronat's consent were obtained to an amendment

---

[4]Mr. Commons' testimony was received with only a single objection directed to the matter of alleged indecencies being committed in automobiles parked on the street in front of residences adjacent to the Patronat.

of the ordinance imposing certain conditions on the use of the property by the Patronat. Mr. Commons testified that these terms were suggested in the hope ''of alleviating or answering in part the objections of the people living in the vicinity.'' The conditions enumerated were substantially as follows: (1) that no alcoholic beverages be sold, served, or consumed on the property at any time; (2) that no ginger ale, water, ice, or other liquid be sold, served, or supplied on the premises to any person *if it is known* that such person is going to mix such ginger ale, water, ice, or other liquid with any alcoholic beverages; (3) that off street automobile parking space of not less than 25,000 square feet be provided, such parking space to be developed and maintained in accordance with the provisions of section 52 of Ordinance 1494, the Zoning Ordinance, Zone ''P'' Parking; (4) that not less than ten (10) water closets for women be provided and not less than nine (9) water closets for men; except that urinals may be substituted for each water closet, but at least two water closets must be installed for men. If a trough urinal is installed, two feet of length may be substituted for each water closet; (5) that attendance of all meetings of any nature be limited to a maximum of 300 people who shall be members of one of the member organizations of the Czechoslovak Patronat or bona fide guests of such members, such guests not to exceed one-fourth of the members present; (6) that meetings shall be concluded, the clubhouse closed, and the group dispersed not later than 10:30 p. m. on every night except Friday and Saturday, when the meetings shall be closed at 12 midnight, and on December 24th and 31st, when the meetings shall be concluded and clubhouse closed and groups dispersed not later than 2 a. m. the following day; (7) that at no time shall there be any use of the building for any meeting open to the general public; (8) that any announcements or advertisements of any function or event to be held at the clubhouse shall be so worded as to limit the invitation to members of the member organizations of the Czechoslovak Patronat; (9) that all cartons, boxes, crates, and other containers shall be stored within the buildings. The Patronat refused to accept the conditions outlined by the planning commission, and its negotiations to obtain a relaxation thereof or a compromise failed. In September, 1950, the board of supervisors adopted Ordinance 5590 repealing the 1933 ordinance which authorized the use of the property by the Patronat as an exception to the residential zoning provisions of the law. Thereafter, the

Patronat undertook to sell the property demised to it by the Biescars.

In December, 1953, plaintiffs, as heirs of the grantors, brought this action and prayed that title be quieted in them on the ground that Ordinance 5590 prevented the use of the property on the conditions set forth under the conveyance by the grantors and that as a result of the Patronat's interest in the property was terminated.

At the trial, the court thoroughly explored the circumstances under which the grant was made and received parol evidence as to what the parties intended by the use of the particular language employed in the instruments of conveyance. Mr. Styskal, the Patronat's attorney, who had prepared the agreement and the deed drawn to effectuate it, stated that he did not attempt to explain to the Biescars the technical difference between covenants and conditions but asserted Mr. Biescar knew that the Patronat accepted the property only as an unqualified gift and that absolutely no reversionary rights remained in him or his successors in interest. The attorney testified that Mr. Biescar wished to make it certain that the property he donated was used as a meeting ground, that it be known as Biescar Park, and that it not be encumbered to avoid possible loss of the property. Mr. Styskal stated these qualifications were embodied in a separate instrument in order not to cloud the Patronat's free and clear title to the property conveyed by the deed. Other testimony was introduced on behalf of the Patronat supportive of the theory that the Biescars intended to make an unconditional gift to the Patronat.

The essential findings made by the court were: (a) that the Biescar deed granted to the Patronat a fee simple subject to the conditions subsequent expressed in the contemporaneously executed agreement, which together with the deed constituted the instrument of conveyance; (b) that the grant by its conditions imposed a duty to use the property "perpetually" as a park or meeting ground and that the grantors were vested with a right of entry or power of termination for breach of the condition; (c) that by reason of the Patronat's misuse of the property, its continued use as a park and meeting place impinged on the convenience of the residents of the neighborhood; (d) that as a result of such misuse of the property by the Patronat, the board of supervisors repealed the ordinance, Number 2305, granting the exception as to the use of the property; that the Patronat breached the conditions of the grant by its misuse of the property; and (f) that by

reason of said breach, the Patronat has no interest in the property, and the heirs of the grantors are the owners of the fee.

At the outset, the Patronat deplores the fact that the trial court apparently treated the deed and agreement, which were executed at the same time, as an integrated instrument. It urges that "nothing supports a finding that they are but one document." ■ However, the rule is well settled that writings contemporaneously executed to express the terms of a particular grant of real property, are held to constitute but a single instrument. (*Downing* v. *Rademacher,* 133 Cal. 220, 224 [65 P. 385, 85 Am.St.Rep. 160] ; *Patterson* v. *Donner,* 48 Cal. 369, 377; *Sledge* v. *Stolz,* 41 Cal.App. 209, 220 [182 P. 340].) In *Downing* v. *Rademacher, supra,* the court observed: "The deed and the agreement constitute one instrument, and must be read as though each referred to the other *and expressly incorporated its terms."* (Italics added.) In the Sledge case, *supra,* the court states: "We must look to the agreement to ascertain the consideration for the execution of the deed, for it was executed and delivered pursuant to the agreement. *The two documents are inseparable."* (Italics added.) ■ The trial court was entitled to treat the instruments here involved in accordance with this rule.

The Patronat assigns as error the determination of the court below that the property was conveyed subject to conditions subsequent rather than upon a simple covenant concerning the use to which the property was to be devoted. ■ In so doing it relies upon cases announcing the familiar rule that clauses in a conveyance imposing obligations on the grantee are to be construed as personal covenants rather than conditions whenever that can be reasonably done in order to avert a forfeiture.[5] That, of course, is a venerable rule of construction. However, such an interpretation will not be given contrary to the intention of the parties; and where it clearly appears that an estate was conveyed subject to condi-

---

[5]The principal cases relied on are *Savanna School Dist.* v. *McLeod,* 137 Cal.App.2d 491 [290 P.2d 593]; *Fitzgerald* v. *County of Modoc,* 164 Cal. 493 [129 P. 794, 44 L.R.A.N.S. 1229]; *Victoria Hospital Assn.* v. *All Persons,* 169 Cal. 455 [147 P. 124]; *Beran* v. *Harris,* 91 Cal.App.2d 562 [205 P.2d 107]; *Hasman* v. *Elk Grove Union High Sch.,* 76 Cal.App. 629 [245 P. 464]; *Gramer* v. *City of Sacramento,* 2 Cal.2d 432 [41 P.2d 543].

Nonetheless, the decisions in each of these cases recognize the rule that the ultimate test is the joint intent of the grantor and grantee.

tions, it will be upheld as such. (*Rosecrans* v. *Pacific Elec. Ry. Co.*, 21 Cal.2d 602, 605 [134 P.2d 245]; *Knight* v. *Black*, 19 Cal.App. 518, 523 [126 P. 512].) ■ The intention of the parties to a deed is to be derived by a consideration of the instrument as a whole rather than of detached clauses, giving due regard to every provision, clause and word, whether of grant, description, qualification or explanation and viewing it in the light of the circumstances surrounding its execution. (*Paddock* v. *Vasquez*, 122 Cal.App.2d 396, 400 [265 P.2d 121]; *Schroeder* v. *Wilson*, 89 Cal.App.2d 63, 66 [200 P.2d 173]; 15 Cal.Jur.2d, § 128, pp. 528-529.) Every part of the instrument is to be given effect if reasonably practicable and consistent with the evident purpose of the grant, each clause helping to interpret the others. (Civ. Code, § 1641; *Brannan* v. *Mesick*, 10 Cal. 95, 106-107; *Barnett* v. *Barnett*, 104 Cal. 298, 300 [37 P. 1049].)

■ It is manifest from a consideration of the deed as a whole and the situation of the parties at the time of the grant that the conveyance was executed with the intent to create an estate upon condition that the property be permanently maintained as a communal gathering place for local residents of Czechoslovakian derivation. The agreement itself is replete with phraseology indicative of an intention to create a conditional estate. While not of controlling significance, it is recited in the preamble that the Patronat is willing to accept the conveyance "on the conditions hereinafter more specifically enumerated." The conditions are then incorporated into the granting part of the instrument, paragraph Second, which commences: "The said grant shall be subject to the following provisions, to wit . . ." Subdivision (a), the alleged condition claimed to have been broken, declares that the property shall be used and dedicated as a park or meeting ground for local Czechoslovakians and to be so administered by the Patronat to enable as many of such persons as possible to enjoy its benefits. Subdivision (b) declares the property shall be designated as "Biescar Park." Subdivision (c) makes it a condition of the grant that no encumbrance shall be placed on the property for 25 years, it being the intent to perpetuate such property, unencumbered, as a meeting place, "as hereinabove more particularly set forth." Subdivision (d) provides for the purchase of shares of water stock as an express condition of the transfer to insure that Biescar Park "shall be amply supplied with necessary water for the uses to which it shall be dedicated." To contend, as does the

Patronat, that only Subdivisions (c) and (d) are conditions because they are so designated but that Subdivision (a), to which (c) and (d) are ancillary in purpose, is a mere covenant would not only be anamolous but would emasculate and render nugatory the paramount intent and object of the conveyance. Subdivisions (c) and (d), which are expressly termed conditions, indicate by reference to the previous subdivisions that their purpose is to subserve and implement the predominant objective of the grant as expressed in Subdivision (a). The express conditions (1) against hypothecation and (2) requiring purchase of water stock were obviously included to insure preservation of the property for the principal purpose intended. It would be a fatuous construction indeed to assert that the Patronat was bound by the requirements of subdivisions (c) and (d) as conditions, but was not bound by a condition that it use the property as a meeting place for the benefit of the Czech public when it is manifest that this latter was the fundamental consideration of the grant. Paragraph Third negates any such unrealistic construction. It states that ''all of *the conditions* above set forth shall be borne out and performed by second party . . . to perpetuate said property at all times for the general good of the CzechoSlovak public.''

Clearly, ''the conditions above set forth'' must necessarily include Subdivision (a), for this is the crucial element of the grant, and unless this condition were performed the cardinal purpose of the donation—to perpetuate the property for the ends intended—would be destroyed and the performance of the other conditions specified would be stripped of any significance. The circumstance that the Patronat paid nothing for the property, coupled with the frequent use of language connoting condition, together with the donors' manifest intent that the property constitute a permanent memorial of their benefaction to the Czechoslovak public, fully justified the court's finding, as a proper statement of ultimate fact, that the estate was devised upon condition that it be used perpetually as a park or meeting ground. The word ''perpetuate'' is used twice in the instrument and it may properly be assumed in the overall context present to have had some import in terms of a possible divestment of the grant. As stated in *Rosecrans* v. *Pacific Elec. Ry. Co.*, 21 Cal.2d 602, 607 [134 P.2d 245], ''Some significance may be given to the use of the word 'forever' . . . If the conditions are to be binding 'forever' it indicates that compliance must be had with the

condition in question 'forever' or perpetually.'' Webster's International Dictionary gives the following phrases in its definition of ''perpetuate'': ''to make perpetual, to come to endure, or to be continued, indefinitely.'' The internal evidence adduced from the language used and the spirit and purpose disclosed by the terms of the instrument as well as the external evidence of the circumstances surrounding the agreement abundantly support the construction arrived at by the court, a reentry clause being unnecessary. (*Taylor* v. *Continental Southern Corp.*, 131 Cal.App.2d 267, 273 [280 P.2d 514] ; *Papst* v. *Hamilton,* 133 Cal. 631 [66 P. 10] ; *Martin* v. *City of Stockton,* 39 Cal.App. 552, 556 [179 P. 894].)

It would be a work of supererogation to analyze and differentiate the various cases cited by the Patronat, previously alluded to in the footnote, in support of its contention that the use to which the property shall be put is merely a covenant rather than a condition of the grant. Obviously, the language used in the instruments is different and does not have the same compelling force as is made patent by the terms employed, the intent manifested therein, and the surrounding circumstances. Furthermore, subdivision (a) here appears in the granting part of the integrated instrument, elaborately qualified and restricted by words of condition, rather than in a habendum clause containing a mere statement as to use without more, which distinguishes this conveyance from those referred to in virtually all cases cited by the Patronat. ■ As stated in *Marshall* v. *Standard Oil Co.*, 17 Cal.App.2d 19, 23-24 [61 P.2d 520] : ''Where the purpose for which the deed is executed appears in the habendum clause, the authorities universally hold that such declaration does not debase the fee, or whatever interest is conveyed in the granting clause. This principle, however, does not apply where the qualifying words appear in the granting clause of the deed. This distinction is made clearly to appear from the following excerpts which we quote from 9 California Jurisprudence, page 274: 'An expression of the purpose of the conveyance as to the use of the property conveyed, ''as for the purpose of a public road,'' or ''for a county high-school ground and premises,'' or for certain religious and educational purposes, are generally held to be directory only, and not to qualify or limit a grant which is in absolute form. But this principle is not applicable where the qualifying words are in the granting part of the deed, and so clearly connected with the word ''grant'' as naturally to

suggest that the intention was merely to convey the right to use the property for a certain purpose.' ''

The Patronat attacks also the court's finding the ordinance which authorized the use of the property in the manner contemplated by the agreement was repealed because of the Patronat's misuse of the property. There is no merit to this contention. The testimony of Mr. Commons which has previously been quoted fully sustains such a finding. While hearsay in character, it was admitted without objection or motion to strike and is competent to support a finding. (*Estate of Doran*, 138 Cal.App.2d 541, 553 [292 P.2d 655]; *Lail* v. *Lail*, 133 Cal.App.2d 610, 621 [284 P.2d 907]; *Smith* v. *Smith*, 135 Cal.App.2d 100, 105 [286 P.2d 1009].) This testimony indicates, in part, that the Patronat permitted various non-Czechoslovakian organizations to use the property and permitted conditions to exist which constituted a nuisance. In an attempt to alleviate these conditions and correlate the use of the property by the Patronat with the convenience of neighboring residents, the planning commission suggested certain conditions of use to which the Patronat refused to accede. The Patronat contends it could not do so because certain of these conditions were contrary to the purpose for which the property was granted. It argues that the commission prescribed ''that attendance of all meetings of any nature be limited to a maximum of 300 people who shall be members of Czechoslovak Patronat,'' a restriction which could not be lived up to in the spirit of the grant. This is not borne out by the language of the agreement. Subdivision (a) only requires that the Patronat so administer the property as would enable as many persons ''to have the benefits and uses of said property as possible.'' This clearly suggests that the Patronat was only required to make available the facilities granted only to the extent possible, whether limited by physical capacity or any reasonable restrictions by a governmental body which would have to grant an exception before the donation could be effective at all for the intended purpose. It was patently never contemplated that all eligible persons would have to be invited or received at any one time. It would have been no violation of the agreement to accept the commission's proposal, which would have enabled the Patronat to perpetuate the use of the property. The Patronat urges that it could not accept the commission's requirement that advertisements of any event shall be so worded as ''to limit invitations to members of the member organizations of the Patronat.'' It contends that

to accept this condition would have done violence to the requirement that the meeting ground be used "for the Czecho-slovak people in the City of Los Angeles and vicinity." However, it is clear that the grantors were primarily interested in the use of the property by the Patronat and its affiliates. The preamble expressly recites the desire of the Biescars to grant the property to the Patronat, "for its use and for the benefit of its constituting members, *and to that extent* to the Czecho-Slovak community of Los Angeles and vicinity." (Italics added.) The commission's recommendation was thus in har-mony with the terms of the grant. Such recommendation, if followed, would also have prevented further violation by the Patronat of the terms of the grant under its practice of renting the property to non-Czechoslovakian organizations, which was expressly prohibited by said grant.

From what has been said, it is clear that the Patronat was not entitled to relief against the conditions of the conveyance under the doctrine of the cases holding that such relief may be granted when it would be oppressive and inequitable to enforce such restrictions by reason of a change in the character of the vicinity. The changes in the character of the neighbor-hood, which at all times was residentially zoned, did not precipitate the repeal of the excepting ordinance nor did it militate against the Patronat's continued use of the property within the spirit of the grant. An effective use of the property on the conditions granted with reasonable regard for the rights of adjacent residents was possible. Indeed, the planning commission offered to work out a modus vivendi on terms that would have eliminated certain abuses which had developed as a consequence of a ráther undisciplined adminis-tration of the property and would have permitted continuity of the uses envisaged by the grant. The Patronat declined to accept these terms. ▮ It cannot now be heard to say that the court should have relieved it from the forfeiture resulting from breach of a condition subsequent when its own conduct engendered the action which ultimately rendered impossible the further use of the property on the conditions imposed. The situation presented was not of a nature calculated to invite the court's invocation of the general rule that equity will not ordinarily enforce a forfeiture. As stated in *Thein* v. *Silver Inv. Co.*, 87 Cal.App.2d 308, 318-319 [196 P.2d 956]: "Equity does not aid one who is the sole cause of his own misfortune. Any forfeiture that here resulted was caused by appellant's own acts ... Under such circumstances no principle

of equity suggests, far less compels, the granting of relief to appellant. He has brought his misfortunes upon his own head.''

Appellant has made a comprehensive attack on the findings, assigning some 16 specifications in which it asserts the findings are either unsupported by the evidence or conclusions of law. This, in part, is mere quibbling. For example, the finding that Ordinance Number 2305 permitted the use of the property here in dispute as a ''park or meeting ground'' is not contrary to the evidence, such use being implicit in the language of the ordinance granting an exception for the maintenance of a clubhouse by the Patronat. ▇ The Patronat's contention that the finding that it has no estate, right, title or interest in the property is a conclusion of law is refuted by *Dam* v. *Zink*, 112 Cal. 91, 93 [44 P. 331], upholding a similar finding as one of ultimate fact, as well as by *McArthur* v. *Goodwin*, 173 Cal. 499 [160 P. 679], and *Hitchcock* v. *Rooney*, 171 Cal. 285 [152 P. 913], which characterize such statements as findings of ultimate fact. ▇ In any event, even if some findings attacked as conclusions are regarded as misplaced conclusions of law, it can avail plaintiff nothing since the specific findings support the conclusions reached, are amply sustained by the evidence, dispose of all the material issues and fully support the judgment.

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied November 13, 1956, and appellant's petition for a hearing by the Supreme Court was denied December 12, 1956. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.