[Civ. No. 30249. Second Dist., Div. One. Oct. 14, 1966.]

VIVA ULDENE LUNDGREN, Plaintiff and Appellant, **v.** HAROLD J. LUNDGREN, Defendant and Respondent.

[Civ. No. 30250. Second Dist., Div. One. Oct. 14, 1966.]

VIVA ULDENE BIBY, Plaintiff and Appellant, v. HAROLD J. LUNDGREN, Defendant and Respondent.

(Consolidated Cases.)

Joseph P. Argenta and F. Walter French for Plaintiffs and Appellants.

Judith B. Aaronson for Defendant and Respondent.

LILLIE, J.—On June 19, 1963, in case No. WEC 3202, Viva Lundgren sued her son Harold to have him declared a constructive trustee on her behalf of real property known as the Caswell Street property alleging that he breached their agreement (that she could reside thereon until her death) made when she deeded the house to him and his wife Albertene on December 28, 1960, and for reconveyance of the property.

On April 1, 1964, in case No. WEC 4747, Viva Biby, daughter of Viva Lundgren, sued her brother Harold and Mrs. Lundgren to reform a quitclaim given to her by Mrs. Lundgren transferring the Caswell Street property to her in January 1954 (it contained a transposed tract number and incorrect map and page numbers), and to quiet her title to the property.

These two cases were consolidated for trial and are consolidated on appeal. The court heard case No. WEC 4747 first and found that Harold, by virtue of joint tenancy grant deed to him and Albertene executed by Mrs. Lundgren on December 28, 1960, was a bona fide purchaser for value without notice or knowledge, either constructive or actual, of Mrs. Lundgren's prior (1954) quitclaim deed to Viva; and that Viva was guilty of laches and unreasonable delay in asserting her claim to the property and bringing her action. Judgment was entered in favor of Viva against Mrs. Lundgren reforming her deed, and against Viva in favor of Harold quieting his title to the property. Viva appeals from that portion of the judgment quieting title in Harold. No appeal is taken from that part of the judgment reforming Viva's deed and the same has become final.

In case No. WEC 3202, the trial court found that as a result of Mrs. Lundgren's execution and delivery of the quitclaim deed to Viva in January 1954, she had divested herself of all right, title, interest and ownership in the property. From judgment dismissing her complaint, Mrs. Lundgren appeals.

At the trial of case No. WEC 4747 (Viva against Harold and Mrs. Lundgren), it was ordered (based upon stipulation) that, having been served with copy of summons and complaint and having failed to answer or appear, Mrs. Lundgren's default be taken; she then testified that on January 23, 1954, she executed and delivered to her daughter, Viva, a quitclaim deed to the property intending, at all times, to give her the same. Accordingly, judgment was entered in favor of Viva reforming her quitclaim deed; the decree of reformation

having become final the quitclaim deed reads and operates as reformed, as of January 23, 1954. Mrs. Lundgren, having previously (1954) transferred the property to Viva, had no interest in the same when by deed she transferred the same property to Harold in 1960; thus, she is not entitled to equitable relief. She must have had some interest in the real property on which she sought to impress a constructive trust, otherwise her position would not have been bettered even had she prevailed. (*Mandeville* v. *Solomon,* 33 Cal. 38, 44; *Ruddick* v. *Albertson,* 154 Cal. 640, 643 [98 P. 1045].) There is no merit to Mrs. Lundgren's unsupported contention herein "that despite her execution of two deeds, first, a quitclaim to her daughter, Viva Uldene Biby, and, second, a grant deed, some years later, to her son, Harold J. Lundgren, legal title is held subject to a beneficial interest in her, through a resulting trust, based on Harold's repudiation of an agreement made when the property was transferred to him." The judgment dismissing Mrs. Lundgren's complaint against Harold was proper.

In findings of fact No. XX the court by reference to the allegations of the answer and counterclaim found that Harold was a purchaser "for valuable consideration" (¶ Ia, answer; ¶¶ I, III, counterclaim—supported by findings of fact Nos. XII, XIV, XVI and XVII); accordingly, the court concluded that Mrs. Lundgren received "a valid, valuable and sufficient consideration from defendant, Harold J. Lundgren." (¶ IV.) Appellant, Viva, claims that Harold failed to prove "*fair* and *adequate* consideration or value." We view the evidence in a light most favorable to respondent and indulge all reasonable inferences in favor of the findings and judgment. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]; *Berniker* v. *Berniker,* 30 Cal.2d 439, 444 [182 P.2d 557].) "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [1] [299 P.2d 231].)

 ". . . When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. (*Primm* v. *Primm, supra,* p. 694 [2].)" (*Grainger* v. *Antoyan,* 48 Cal.2d 805, 807 [313 P.2d 848].)

Mrs. Lundgren purchased the property on Caswell Street in 1939 and lived on the premises with her three children; later they moved to Nevada and she rented the house. She was having some difficulty with her second husband and in latter 1953 went to a notary to deed the Caswell Street property to Viva, then 14; Harold was 16 years old. The deed was a grant deed dated January 23, 1954, and conveyed the property to Viva as a gift; Viva gave no consideration therefor. After Harold's marriage and on December 5, 1960, Mrs. Lundgren orally agreed to deed the same property to him if he would make all repairs necessary to the premises, pay certain of her debts and permit her to reside in the property until she was able to resettle and resituate elsewhere; Harold agreed and accordingly, by joint tenancy deed to Harold and Albertene dated December 5, 1960, and recorded December 28, 1960, Mrs. Lundgren conveyed the property to Harold.

The following circumstances led to this oral agreement and conveyance. Prior to September 1960, Mrs. Lundgren had the house rented but because of the dilapidated condition of the property the tenants notified her they would have to move unless she repaired it. They told her that the premises were unliveable—the shower had caved in and the termites and dry rot had eaten the bathroom floor and it also was about to cave in. In September 1960 she so advised Harold and Albertene and told them that she did not have the money to fix up the bathroom and make the necessary repairs; she could not rent the property without the repairs being made because the house in its present condition could not be occupied; she had no money with which to meet the mortgage payments and taxes coming due; she had no income other than an hourly wage she earned working during luncheons at the Elks Club; her car was about to be repossessed and she could not make the next payment; and she had no place to live and if she could not find a place temporarily she would be left on the street. She told Harold that she didn't know which way to turn, she couldn't take care of the place, and she was going to lose the house anyway and would rather convey the property to him and let him take over the payments, her bills and repairs if he would let her live there temporarily until "she got reestablished"; that if he and Albertene did this the home would be theirs in joint tenancy; and that the house was a white elephant as far as she was concerned and neither his brother nor sister (Viva) wanted it.

There is no doubt that in September 1960 the property was

in a dilapidated condition and in greet need of extensive repairs; and that Mrs. Lundgren was in debt, lacked funds or the means of obtaining the same, and was unable to finance the repairs, make payments, pay the taxes, find a place to live and pay her debts. The overwhelming evidence points to an oral agreement in December 1960 whereby Mrs. Lundgren would convey the property to Harold and Albertene if Harold would make the necessary repairs to the house, pay her debts, and permit her to live there until she could resettle. Thus upon conveyance of the property Harold set out to perform his part of the agreement. He applied to the Bank of America, where he was employed, for a loan on the property; it was refused because of the dilapidated condition of the house. He did receive a $2,000 salary loan, the proceeds of which he used, together with some funds of his own, initially to repair the house, pay the taxes, other expenses and mortgage payments, and pay Mrs. Lundgren's debts. Harold and his wife and others personally did the repair work to save labor costs. In January 1961, Mrs. Lundgren moved into the house with Harold and Albertene. Finally, in December 1961, the house was in sufficiently good condition to enable him to refinance the loan through Western Federal Savings & Loan Association. As a result, Harold's salary loan with the Bank of America was paid off and the trust deed existing at the time Mrs. Lundgren conveyed the property to Harold was incorporated in a new deed of trust. Mrs. Lundgren continued to live in the house with Harold and his wife until June 1962 when she moved to Reno, Nevada.

It is conceded that Harold and Albertene had no notice of the 1954 quitclaim deed to Viva; because of the erroneous tract and incorrect map book and page numbers, Viva's deed did not appear in the chain of title. Harold knew nothing of the deed until 1963 when Viva commenced her action and a lis pendens was recorded on the property. Viva admitted in her testimony that at no time did she tell Harold about the 1954 deed.

Appellant's main contention is that Harold was not an innocent third party despite lack of notice of the prior deed; she argues that he gave "mere consideration"; not "adequate and substantial value." (*Warden* v. *Wyandotte Savings Bank,* 47 Cal.App.2d 352 [117 P.2d 910].) She refers to Harold's testimony and the deed containing the statement, "for a valuable consideration" and the notation "consideration less than $100.00 no revenue stamp required." She

claims that the value of that given by him does not bear a reasonable proportion to that received.

█ In determining whether consideration was fair and adequate, all circumstances surrounding the transfer of the property as they existed at that time, must be considered. (*Fish* v. *Benson*, 71 Cal. 428, 439 [12 P. 454].) █ The fairness or adequacy of the consideration cannot be judged or estimated in relation to events which transpired subsequent to the time of the conveyance; if the consideration was adequate at the time, it is immaterial that subsequent events such as a change in the property value make it inadequate later. *O'Hara* v. *Wattson*, 172 Cal. 525, 535 [157 P. 608]; *O'Connell* v. *Lampe*, 206 Cal. 282, 285 [274 P. 336].) █ Further, the consideration to be adequate need not amount to the full value of the property. (*Foley* v. *Cowan*, 80 Cal.App.2d 70, 76 [181 P.2d 410].) "An adequate consideration does not necessarily mean a price measuring fully up to the value of the property. Such comparison is but a factor to be considered with all of the other facts and circumstances (*Wilson* v. *White*, 161 Cal. 453 [119 P. 895]; *Dore* v. *Southern Pac. Co.*, *supra* [163 Cal. 182 (124 P. 817)]; *Haddock* v. *Knapp*, 171 Cal. 59 [151 P. 1140]; *O'Hara* v. *Wattson*, 172 Cal. 525 [157 P. 608]; *Schader* v. *White*, 173 Cal. 441 [160 P. 557]). █ The finding of the trial court should not be set aside unless it is clear that it has no sufficient support in the evidence (*Wilson* v. *White*, *supra*; *Boulenger* v. *Morison*, 88 Cal.App. 664 [264 P. 256])." (*Williams* v. *Rush*, 134 Cal.App. 554, 559-560 [25 P.2d 888].)

█ The circumstances under which Mrs. Lundgren deeded the property to Harold and the money and effort expended by him on her behalf and his assumption of liability in connection with the property support the trial court's finding. Harold's mother was in serious financial distress and had no place to live in December 1960; she had no funds and no means of obtaining them; she was deeply in debt; her car was about to be repossessed; the property could not be rented in its dilapidated condition and expensive repairs were needed; she could not make the payments on the mortgage or pay the taxes; and "the house was a white elephant as far as she is concerned," no one else wanted it, and she was "going to lose the house anyway." While it is true that Harold had little funds on hand, he did have the means of obtaining the money necessary to make the repairs and did have the ability to do the manual labor therefor and maintain the premises. Thus, at the time,

the property was as good as lost to Mrs. Lundgren and could only be of benefit to her if Harold took it, repaired it and permitted her to reside thereon until she could resettle herself. In addition, in taking the property off her hands, Harold relieved Mrs. Lundgren of further liability in connection therewith and for her personal debts, and gave her a place in which to live for almost two years—all of considerable value to Mrs. Lundgren in 1960.

Harold initially spent approximately $2,200 in repairs from January 1961 to August 1961; in December 1961 he was able to refinance the property, receiving an additional $2,260.72 which he used for further repairs. Most of the work he, Albertene and others did themselves. In 1963 he again refinanced the property; all prior loans were repaid and after expenses Harold netted $288.79 which he also used for repairs. He could not remember all of the debts he paid for Mrs. Lundgren, but recalled making monthly $50 payments on her automobile for four or five months and paying a $175 Sears Roebuck bill and $150 Texaco charge. In addition, in 1962 Mrs. Lundgren wanted $1,500 for herself and his brother, Emil; thus, Harold obtained a $1,500 loan from Aames Mortgage Company secured by a second trust deed against the house and, with the exception of the cost of the escrow, he lent the remainder to her; there is no evidence she ever repaid the loan or that he ever demanded repayment. Harold also paid the escrow fees and costs ($277) incurred at the time of the conveyance in 1960, the 1961-62 real property taxes ($185.58), and 1963 taxes ($260.84), and a lumber bill of $200.

In brief, Harold spent approximately $4,750 to repair the premises, expended his own time and energy in doing the physical labor therefor, assumed Mrs. Lundgren's liability in connection with the property, paid her bills in the amount of at least $525, incurred miscellaneous expenses ($923.42) in connection with the property, lent Mrs. Lundgren $1,500 and gave her a home for two years. Harold testified that in December 1960, the value of the property was approximately $12,000, subject to a deed of trust representing a balance due of $5,000; that in 1963 he listed it for sale for $19,500, subject to a $10,000 trust deed. The evidence more than establishes Harold's status as a bona fide purchaser for fair and adequate consideration.

The evidence also supports the conclusion that Viva "has been guilty of laches and unreasonable delay in asserting her claim . . . and in bringing this action to quiet her

title. . . ." (§ VI.) In December 1960 Viva was fully aware of and knew of the existence, execution and delivery of the joint tenancy grant deed from her mother to Harold and Albertene conveying the property already conveyed to her in 1954; she discussed the deed to Harold with him prior to December 5, 1960, but admitted she at no time before or after advised him of her deed. She was fully cognizant that Harold entered upon and took possession of the premises, saw him periodically while he was living thereon and repaired the property, and knew of his expenditures in improving the same, paying the taxes, making the payments, and adding to its value. Viva also knew that neither Harold nor Albertene had any knowledge of the prior transfer of the property to her; she admitted that she received the property in 1954 as a gift for which she paid nothing, paid no taxes, insurance or payments on the mortgage, made no repairs, expended no funds towards its maintenance and upkeep, contributed nothing to the property and did no work in connection therewith. At no time did she take any interest in the property; prior to the commencement of her action (April 1, 1964) she neither made claim to the property nor made known to Harold that she claimed or asserted any interest therein adverse to him even though she knew Harold was spending money to improve the property and claiming and exercising ownership over it. Two and one-half years elapsed before Harold had any knowledge that Viva had any deed to the property (December 1960— June 19, 1963, when lis pendens was recorded on the property) and almost three and one-half years before Viva actually asserted her adverse claim (December 1960—April 1, 1964).

Viva's argument that she cannot be charged with laches because Harold learned in June 1963 that *Mrs. Lundgren* assailed his claim of ownership, thus her delay in filing the action against him could work no prejudice, is without merit. It overlooks the established fact that Viva could and should have stopped the entire transaction in 1960; her failure to do so resulted in two and one-half years of time and effort and considerable money expended by Harold in repairing, maintaining and improving the property and the assumption of her liability on the property and for her debts—only because he believed he owned the property. Can Viva, who sat quietly by permitting Harold to make the property marketable, now come forward and seek the benefits? Viva asked the court to give her moneys she has not earned and property she did not want in

1960 and would have lost because of her unwillingness to take it over. ▮ The length of time is not as important as that which resulted from the delay. " 'No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. ▮ It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and to make valuable the property he holds,' etc. ▮ Or, in other words, one is not permitted to stand by while another develops property in which he claims an interest, and then if the property proves valuable, assert a claim thereto, and if it does not prove valuable, be willing that the losses incurred in the exploration be borne by the opposite party. This thought was expressed in one case by the following language: 'If the property proves good, I want it; if it is valueless, you keep it.' " (*Livermore* v. *Beal,* 18 Cal.App.2d 535, 549 [64 P.2d 987]; *Vesper* v. *Forest Lawn Cemetery Assn.,* 20 Cal.App.2d 157, 165-166 [67 P.2d 368]; see § 3527, Civ. Code.) ▮ " 'Laches is a question of fact, on the evidence, and must be determined by a consideration of all the circumstances of each particular case. (Citation.) ▮ It is a question to be determined primarily and very largely by the trial court, and an appellate court will not interfere with its discretion in this respect unless manifest injustice has been done, or unless its conclusion cannot reasonably be held to find support in the evidence.' " (*Gutknecht* v. *Paul,* 83 Cal.App. 2d 356, 357 [188 P.2d 764]; see also *Merry* v. *Garibaldi,* 48 Cal.App.2d 397, 410 [119 P.2d 768].)

Finally, appellant claims that Harold, having received the property for a fraction of its value, is unjustly enriched at her expense and that of Mrs. Lundgren if he is permitted to retain it absolutely and unconditionally. ▮ In concealing her claim of title when she had the opportunity to reveal the existence of the deed to Harold in December 1960, Viva, who paid nothing for the property and did nothing to improve and maintain the same, is in no position now several years later to seek equitable relief or to assert that Harold is the recipient of an unjust enrichment. ▮ The same applies to Mrs. Lundgren, for it appears that neither has come into court with clean hands. (*Seymour* v. *Cariker,* 220 Cal.App.2d 300, 305 [33 Cal.Rptr. 727]; *Biescar* v. *Czechoslovak-Patronat,* 145 Cal.App.2d 133, 147 [302 P.2d 104]; *Thein* v. *Silver Invest-*

*ment Co.*, 87 Cal.App.2d 308, 318-319 [196 P.2d 956].) But in consideration of Harold's efforts how does it appear that he has obtained a benefit which he may not justly retain?

The judgment in each case is affirmed.

Wood, P. J., and Fourt, J., concurred.