[No. C058154. Third Dist. Sept. 1, 2009.]

DENNIS C. STEVENS, Plaintiff and Appellant, v.
TRI COUNTIES BANK, Defendant and Respondent.

238

## COUNSEL

Murphy, Campbell, Guthrie & Alliston, George E. Murphy, Suzanne M. Nicholson; and William A. Ward for Plaintiff and Appellant.

C. Athena Roussos; Law Office of Philip J. Rhodes and Philip J. Rhodes for Defendant and Respondent.

## OPINION

**SCOTLAND, P. J.**—This appeal concerns the interpretation and application of the California Multiple-Party Accounts Law (CAMPAL). (Prob. Code, § 5100 et seq.)

In 1996, plaintiff, Dennis C. Stevens, and his wife, Jackie, opened a joint bank account with defendant, Tri Counties Bank.[1] At some point, Jackie's sister, Nancy Wrinkle, was added to the account and withdrew all the money.

Dennis, who sued the bank for breach of contract, appeals from the judgment entered in Tri Counties' favor. He contends the trial court erred in concluding that Tri Counties did not violate Probate Code section 5303 when

---

[1] Because Dennis and Jackie share the same last name, we shall refer to them by their first names for simplicity and to avoid confusion.

it added Wrinkle to the joint bank account without Dennis's and Jackie's written approval, and further concluding that, in any event, the provisions of Probate Code section 5303 do not apply to this controversy because of Probate Code 5201. (Further section references are to the Probate Code unless otherwise specified.)

We shall reverse the judgment. As we will explain, the joint bank account contract with Tri Counties incorporated California law relating to such agreements, except to the extent that the contract explicitly varies from California law. Such a law is section 5303, which contains specific limitations on how the terms of a multiple-party account can be changed, for example by adding another person to the account. The contract in this case does not provide a method that varies from the provisions of section 5303. The trial court incorrectly held that the contract is not governed by section 5303 due to section 5201, which states the provisions of the statutory scheme commencing with section 5301, "concerning beneficial ownership as between parties . . . of multiple-party accounts, are relevant only to controversies between these persons and their creditors and other successors, and have no bearing on the power of withdrawal of these persons as determined by the terms of account contracts. [¶] . . . The provisions of Chapter 4 (commencing with Section 5401) govern the liability of financial institutions who make payments pursuant to that chapter." However, section 5201 simply absolves financial institutions of any liability for paying to a party with a multiple-party account a sum from the account that is more than that person's beneficial ownership in the account funds, i.e., the proportion of that person's contribution to the account, *provided that the person to whom the institution pays the money is a proper party to the account.* Whether a person is a proper party to the account is governed by section 5303, unless the terms of the account vary from the provisions of section 5303. Section 5201 does not deprive account holders of recourse against financial institutions that permit a party to withdraw funds from a multiple-party account when the person is not a proper party to the account pursuant to section 5303 and the account contract. Because the way in which Tri Counties added Wrinkle to the account in this case did not conform to the requirements of section 5303 incorporated in the account contract, Tri Counties can be liable for breaching the contract when it allowed Wrinkle to withdraw all of the money in the account.

## FACTS

The parties' agreed statement of facts discloses the following:

On July 30, 1996, Dennis and Jackie both signed a multiparty signature card for a joint account at Tri Counties, which covered two preexisting deposit accounts. The account title is "Stevens, Dennis C or Jackie A."

Another signature card, containing only Wrinkle's signature, bears the same date, lists just one of the deposit accounts noted on the other signature card, and titles the account, "STEVENS, Dennis C or Jackie A or Wrinkle, Nancy D."

Other evidence disclosed that Wrinkle was not added to the account in 1996, as indicated by the signature card she signed, but at some later date. Wrinkle testified she was certain that she, Jackie, and Dennis went to Tri Counties directly from Jackie's doctor's office when Jackie was diagnosed with cancer in July 1997. According to Wrinkle, she was added to the joint account at that time because she helped care for Jackie's developmentally disabled adult daughter, and because Wrinkle became almost a live-in maid and caregiver for Jackie while Jackie was undergoing chemotherapy.

Dennis disputed the extent of Wrinkle's involvement as a caregiver, and he testified that he never authorized her addition to any deposit account and never discussed doing so with Jackie. Dennis denied that the three of them went to the bank together to add Wrinkle to the account.

Monica Canchola, Tri Counties Bank's vice-president, testified that in September 1997, the bank stopped using the signature card format used by Dennis, Jackie, and Wrinkle. If Dennis and Jackie had added Wrinkle to the account after September 1997, the bank would have required all three of them to sign one signature card.

Dennis and Jackie separated in May 2001, but agreed that Jackie would continue to use their joint account for her expenses and that Dennis would continue to deposit funds into the account. All of the bank statements were sent to Jackie's address.

In early 2004, Dennis and Jackie sold a rental property they owned jointly and deposited approximately $80,000 in sales proceeds into their joint account. According to Wrinkle, while Jackie was in the hospital in Oregon, she asked Wrinkle to withdraw all the money from the bank account and pay $30,000 to Jackie's "significant other," Richard, for money she owed him for their joint purchase of a fifth wheel trailer and other living expenses. Wrinkle also asserted that Jackie instructed her to pay some other miscellaneous expenses and to keep the remaining funds. Wrinkle returned to California and followed Jackie's instructions. The withdrawals occurred on or after August 18, 2004.

On September 20, 2004, Jackie died from cancer. Dennis was the executor and sole beneficiary of her will. Within 30 days of her death, he went to the bank to check on the available balance in the account to pay Jackie's debts.

There, he discovered that Wrinkle had closed the account after withdrawing over $50,000. Dennis complained to Tri Counties that he had not given permission to add Wrinkle to his multiparty account with Jackie.

Ray Block, the branch manager, conducted an internal inquiry and learned that Nancy Ferguson, a bank employee, recalled speaking to Dennis about adding Wrinkle to the account after Jackie was admitted to a hospital in Seattle in 1998. Dennis denied having done so. Contrary to Tri Counties' answers to interrogatories, Ferguson stated that she did not personally add, or supervise adding, Wrinkle to the account.

Tri Counties' 1996 "Service and Disclosure" pamphlet, which was incorporated in the multiparty account agreement, did not contain any language about adding a "signer" to the account. However, the bank's internal operations manual stated that one of the original signers must be present to add an additional signer, and that a new signature card must be completed with all authorized signers. Bank manager Block testified that only a manager would have the authority to depart from these procedures and that bank employee Ferguson lacked the necessary authority. Bank vice-president Canchola testified that the manual was only a set of guidelines and that employees have the discretion to depart from these procedures. As a community bank with a focus on customer service, Tri Counties accommodated its customers; thus, if either Dennis or Jackie called and spoke with a bank employee acquainted with either one of them, the employee could have, as a courtesy to them, added Wrinkle to the account based on the oral request. However, it was more likely that either Dennis or Jackie came into the bank with Wrinkle to have her sign the signature card.

Dennis sued Tri Counties for breach of contract, alleging the bank violated section 5303 of CAMPAL, and the bank's agreement with him, by adding Wrinkle to the account without written consent. According to Dennis, section 5303, subdivision (b) provides that the terms of a multiparty account, such as the one owned by Dennis and Jackie, can be changed only by (1) closing it and reopening it under different terms, (2) presenting to the bank a modification agreement signed by all parties with a present right of withdrawal, or (3) complying with a method of modification provided for in the term of the account agreement.

Tri Counties denied that section 5303 applied. This is so, it argued, because section 5201 states that said portion of the Probate Code is relevant only to controversies between the parties and creditors, not between the parties and the bank.

The trial court ruled in favor of Tri Counties. Its statement of decision found: Both Dennis and Jackie had full authority as joint tenants to affect any

disposition of the joint tenancy account, including withdrawing all of the funds at any time or adding a third joint tenant. Nothing in the deposit agreement required the bank to obtain the written consent of the account owners to add a third account owner. Although Dennis knew that Jackie, from whom he was separated, could withdraw the funds completely, he deposited the funds in question into the joint account.

The trial court further found that Wrinkle did not sign the signature card on July 30, 1996, as the card indicated, but did so at some later date. Nevertheless, there were reasons for either Dennis or Jackie to add Wrinkle as an account owner, and a bank employee recalled discussing the issue with Dennis. As plaintiff, Dennis had the burden to prove that neither he nor Jackie consented to adding Wrinkle. The court intimated that Dennis had not met his burden of proof.

The court ruled that Tri Counties did not violate section 5303 by permitting the addition of Wrinkle because (1) she was added as a joint tenant in accordance with the deposit agreement, and (2) section 5201 rendered section 5303 inapplicable to the controversy between Dennis and Tri Counties.

## DISCUSSION

Dennis argues the trial court erred in ruling that Wrinkle was added to the joint bank account in compliance with section 5303, which states: "(a) The provisions of Section 5302 as to rights of survivorship are determined by the form of the account at the death of a party. [¶] (b) Once established, the terms of a multiple-party account can be changed only by any of the following methods: [¶] (1) Closing the account and reopening it under different terms. [¶] (2) Presenting to the financial institution a modification agreement that is signed by all parties with a present right of withdrawal. If the financial institution has a form for this purpose, it may require use of the form. [¶] (3) If the provisions of the terms of the account or deposit agreement provide a method of modification of the terms of the account, complying with those provisions. [¶] (4) As provided in subdivision (c) of Section 5405 [concerning written notification limiting withdrawals following a court order]. [¶] (c) During the lifetime of a party, the terms of the account may be changed as provided in subdivision (b) to eliminate or to add rights of survivorship. Withdrawal of funds from the account by a party with a present right of withdrawal during the lifetime of a party also eliminates rights of survivorship upon the death of that party with respect to the funds withdrawn."

He contends the multiparty account contract with Tri Counties expressly incorporated California law as follows: "This agreement is subject to applicable federal laws and the laws of the [S]tate of California (except to the

extent that this agreement can and does vary such rules or laws)." The agreement did not provide a method for adding a joint tenant to the account that varied from section 5303; in fact, it provided no method at all. Therefore, section 5303 applied and subdivision (b) delimits the manner in which a person may be added to a multiparty account. He and Jackie did not close the account and reopen one with Wrinkle. They did not give Tri Counties a signed written modification adding Wrinkle to their account. And the provisions of their account did not provide any other method for modifying it or adding another party without written authorization. Thus, the trial court erred in ruling that Wrinkle was added in accordance with section 5303 and the terms of the multiparty account agreement.

Dennis also contests the trial court's conclusion that Tri Counties' liability was not governed by section 5303 in light of section 5201, which states: "(a) The provisions of Chapter 3 (commencing with Section 5301) concerning beneficial ownership as between parties, or as between parties and P.O.D. [pay-on-death] payees or beneficiaries of multiple-party accounts, are relevant only to controversies between these persons and their creditors and other successors, and have no bearing on the power of withdrawal of these persons as determined by the terms of account contracts. [¶] (b) The provisions of Chapter 4 (commencing with Section 5401) govern the liability of financial institutions who make payments pursuant to that chapter."

Dennis claims that, contrary to the trial court's ruling, section 5201 does not render all of chapter 3 inapplicable to a determination of the bank's liability—only those portions dealing with the parties' beneficial ownership of the account and their right of withdrawal. As long as the bank pays a proper party to a multiparty account in accordance with the terms of the account, it is absolved of any liability for paying more than the party's beneficial ownership. But, in Dennis's view, that does not mean the bank has no liability if it pays someone who has no right of withdrawal at all because the person was not added to the account in accordance with the express specifications of section 5303.

We agree with Dennis's interpretation of section 5201 in light of other provisions of CAMPAL.

The words of a statute must be construed in context, and the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. (*Kray Cabling Co. v. County of Contra Costa* (1995) 39 Cal.App.4th 1588, 1592 [46 Cal.Rptr.2d 674].)

CAMPAL is based on article 6 of the Uniform Probate Code, entitled "Nonprobate Transfers on Death." (4 Witkin, Summary of Cal. Law (10th ed.

2005) Negotiable Instruments, § 77, p. 441; Recommendation Relating to Nonprobate Transfers (Sept. 1982) 16 Cal. Law Revision Com. Rep. (1982) pp. 129, 131; see also *Lee v. Yang* (2003) 111 Cal.App.4th 481, 487 [3 Cal.Rptr.3d 819].) The purpose of CAMPAL is to make it easier to transfer property on death without probate, particularly for those with small estates. CAMPAL applies to banks and similar financial institutions. (*Lee v. Yang, supra,* 111 Cal.App.4th at p. 487; § 5128.) It determines the rights of the parties, before and after death, for joint accounts, pay-on-death accounts (P.O.D.) and Totten trust accounts. (§§ 5301–5307.) It also protects financial institutions from liability for making payments to parties or to successors in accordance with the law. (§§ 5401–5407.)

Chapter 3 of CAMPAL (§§ 5301–5307) contains provisions concerning the respective ownership rights of parties to a multiparty account. For example, while the parties to a multiparty account are alive, the account belongs to them in proportion to their net contributions to the sums on deposit, unless there is clear and convincing evidence of a different intent. (§ 5301.) Section 5302 governs the sums remaining upon the death of a party. In a joint account, the sums remaining on deposit belong to the surviving party, and when there are multiple surviving parties, their respective ownership interests during lifetime are in proportion to their previous ownership interests under section 5301, augmented by an equal share for each survivor of any interest the decedent may have owned in the account immediately prior to death. (§ 5302, subd. (a).) Section 5302 also has provisions for P.O.D. accounts and Totten trusts (§ 5302, subds. (b), (c)), but "[i]n other cases, the death of any party to a multiple-party account has no effect on beneficial ownership of the account other than to transfer the rights of the decedent as part of the decedent's estate." (§ 5302, subd. (d).) Other portions of chapter 3 make clear that community property presumptions apply to accounts held by spouses unless the parties have provided otherwise in writing. (§§ 5305, 5307.)

Chapter 4 of CAMPAL (§§ 5401–5407) concerns the protection of financial institutions. It authorizes institutions to enter into multiparty accounts (§ 5401, subd. (a)) and establishes conditions under which funds in accounts may be paid (§§ 5401 subds. (b), (c) [generally], 5402 [joint account], 5403 [P.O.D. account], 5404, 5406 [Totten trust account], 5407 [payment to minor]). As relevant to this case: "Any multiple-party account may be paid, on request and according to its terms, to any one or more of the parties or agents." (§ 5401, subd. (a).) " 'Party' means a person who, by the terms of the account, has a present right, subject to request, to payment from a multiple-party account other than as an agent." (§ 5136, subd. (a).) An "agent" is "a person who has a present right, subject to request, to payment from an account as an attorney in fact under a power of attorney." (§ 5124.)

The "financial institution is not required to do any of the following: [¶] (1) Inquire as to the source of funds received for deposit to a multiple-party account, or inquire as to the proposed application of any sum withdrawn from an account, for purposes of establishing net contributions. [¶] (2) Determine any party's net contribution. [¶] (3) Limit withdrawals or any other use of an account based on the net contribution of any party, whether or not the financial institution has actual knowledge of each party's contribution." (§ 5401, subd. (c).)

If payment is made according to the statutory conditions, the financial institution is discharged from liability with respect to the amounts paid (§ 5405, subd. (a)), unless it has been served with a restraining order before payment is made (§ 5405, subd. (b)). This discharge from liability applies "whether or not the payment is consistent with the beneficial ownership of the account as between parties, P.O.D. payees, or beneficiaries, or their successors." (§ 5405, subd. (a).) This protection from liability "has no bearing on the rights of parties in disputes between themselves or their successors concerning the beneficial ownership of funds in, or withdrawn from, multiple-party accounts . . . ." (§ 5405, subd. (d).)

The aforementioned provisions of chapters 3 and 4 lend context to section 5201, and demonstrate it is not as broad as Tri Counties claimed and as the trial court ruled. Section 5201, subdivision (a) merely states that the provisions of chapter 3 *concerning beneficial ownership* between parties or beneficiaries are relevant only to controversies between these persons and their creditors or successors and do not affect the power of withdrawal given these persons by the terms of their account contracts. In other words, the provisions concerning ownership based on net contributions, community property interests, and other factors do not affect the parties' power of withdrawal, and the bank will not be liable if it permits one party to withdraw more than his or her beneficial interest in the account. If a party's withdrawal exceeds his or her net contribution or community property share, that is a matter to be resolved between the parties and it is not the bank's responsibility to police the issue.

■ Given the unfettered power of withdrawal shared by the parties to multiparty accounts regardless of their relative beneficial ownership of the funds on deposit, the designation of the parties to the account is of critical importance. Although chapter 4 of CAMPAL protects the bank from liability for permitting a party to withdraw more than the party's beneficial interest, this presupposes the person is a proper party. A party is a person who, "by the terms of the account" has a right to payment from a multiparty account (§ 5136, subd. (a)), and the terms of the account "can be changed only by" a method set forth in section 5303, subdivision (b). Section 5303 concerns

more than just the beneficial ownership of an account. It protects the account holders who, having opened a multiparty account, accept the risk that the other party might withdraw all the money, but have the security of limiting who is a party with whom this risk is taken and to whom the bank may release any funds.

■ Here, Dennis chose to risk sharing an account with his spouse, Jackie, secure in the knowledge that, if she withdrew all the money and opened a new account with the funds, he would have recourse against her to recover his community property share. (§§ 5305, 5307.)[2] Tri Counties would have no liability for permitting Jackie to withdraw all the funds in accordance with the terms of the account, which permitted each party "acting alone" to "withdraw or transfer all or any part of the account balance at any time." (See §§ 5401, subd. (a), 5405, subd. (a).) However, the bank's ability to permit a party "acting alone" to withdraw all funds without incurring any liability does not give the bank carte blanche to add another party to the account without the consent of the original parties in accordance with the methods specified in section 5303.

Under Tri Counties' interpretation of section 5201, a financial institution could (1) allow anyone to be added to any account at any time without written authorization by the original parties to the account or some other form of compliance with section 5303; (2) pay the entire account balance to the new party; (3) claim that an original party had asked the bank to add the new party; and (4) disclaim all liability in an action by the original parties on the theory that it had paid the money to a "party" and section 5201 made compliance with section 5303 inapplicable to the bank.

■ It is doubtful the Legislature intended such an absurd result, and the statutory language does not support such a construction. A statute's words ordinarily provide the most reliable indication of legislative intent (*Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1153 [69 Cal.Rptr.2d 329, 947 P.2d 291]), and we generally avoid an interpretation that

---

[2] The Law Revision Commission Comments to section 5305 state: "If a spouse has the unilateral right to withdraw funds from the joint account, that spouse may terminate all rights of survivorship by withdrawing the funds from the account and depositing them in another account that does not give the spouses rights of survivorship. Either spouse could then dispose of his or her share of the funds in the new account by will. One spouse may not, however, deprive the other spouse of community property rights by unilateral action with respect to funds in a joint account created with community property funds. For example, if a spouse withdraws community property funds from a joint account and deposits the funds withdrawn in an account in his or her name, this does not change the community property interest of the other spouse in the funds so deposited. See subdivision (d). See also Section 5307 (account expressly described in account agreement as a 'community property' account is governed by law governing community property generally)." (Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 5305, p. 637.)

renders any portion of the statute superfluous, unnecessary, or a nullity as we presume the Legislature does not engage in idle acts. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 634 [59 Cal.Rptr.2d 671, 927 P.2d 1175]; *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1058–1059 [48 Cal.Rptr.2d 1, 906 P.2d 1057].)

■ Section 5201 does not state that chapter 3 in its entirety applies only to the parties to an account and not to the financial institutions in which the accounts are held; it merely states that "[t]he provisions of Chapter 3 . . . *concerning beneficial ownership*" have relevance only to disputes between the parties and do not affect their right of withdrawal. Section 5303 concerns more than beneficial ownership of an account; it dictates the sole methods for modifying the account terms. Nothing in section 5201 absolves financial institutions of liability for violating section 5303 by adding a party to an account without the statutorily prescribed authorization. Indeed, as Dennis points out, Georgia law—from which section 5303 is drawn—supports this determination.

The Law Revision Commission Comments to section 5303 state: "Subdivision (a) is the same as the first sentence of Section 6-105 of the Uniform Probate Code (1987). . . . [¶] Subdivision (b) is substituted for the remainder of the Uniform Probate Code section and is drawn from Georgia law. See Ga. Code Ann. § 7-1-814 (1989) . . . ." (Cal. Law Revision Com. com., Deering's Ann. Prob. Code, *supra*, foll. § 5303, p. 634.) Said Georgia statute provides in part: "Once established, the terms of a multiple-party account can be changed only: [¶] (1) By closing the account and reopening it under different terms; or [¶] (2) By presentation to the financial institution of a modification agreement in a form satisfactory to the financial institution and signed by all parties with a present right of withdrawal." (Ga. Code Ann. § 7-1-814.)

Dennis relies in part on *Tucker Federal Sav. & Loan Ass'n v. Rawlins* (1993) 209 Ga.App. 649 [434 S.E.2d 94], in which Tucker Federal improperly added a third party to a joint tenancy CD (certificate of deposit) in violation of OCGA (Official Code of Georgia Annotated) section 7-1-814, a statute analogous to Probate Code section 5303. On appeal, Tucker Federal argued that the trial court should not have instructed the jury concerning this statute because OCGA section 7-1-811, which is analogous to Probate Code section 5201, stated " 'Code Sections 7-1-812 through 7-1-814, concerning beneficial ownership as between parties or as between parties and P.O.D. payees or beneficiaries of multiple-party accounts, are relevant only to controversies between those persons and their creditors and other successors and have no bearing on the power of withdrawal of these persons as determined by the terms of account contracts. Code sections 7-1-816 through 7-1-821 govern the liability of financial institutions which make payments pursuant thereto

and their setoff rights.' " (434 S.E.2d at pp. 96–97.) The court of appeals was not persuaded: "The language of that Code section makes it clear that the provisions of OCGA §§ 7-1-812; 7-1-813; and 7-1-814 do not apply in disputes involving financial institutions and their customers concerning whether a party can properly withdraw funds in compliance with the terms of the applicable account contract. It would be absurd, however, to hold as Tucker Federal urges that these statutes, in particular OCGA § 7-1-814 which establishes the procedure for making changes to multiple-party accounts, cannot be considered in determining whether there has been a breach of the duty owed by financial institutions to properly handle transactions for their customers. For this reason, Tucker Federal's argument that these Code sections should not have been charged because, pursuant to OCGA § 7-1-811, they are inapplicable to this dispute must fail." (*Id.* at p. 97.)

Dennis also relies on *Ralston v. Etowah Bank* (1993) 207 Ga.App. 775 [429 S.E.2d 102] (hereafter *Ralston*), in which Carson, a joint checking account owner, brought suit against the bank to recover money transferred to Ralston, his wife's nephew who was added to the account by Carson's wife without obtaining Carson's approval. After the death of Carson's wife, and upon Ralston's request, the bank transferred $50,000 from the joint account into an account under Ralston's control. (*Id.*, 429 S.E.2d at p. 103.) The trial court granted partial summary judgment in favor of Carson against the bank in the amount of $50,000 plus interest. (*Id.* at p. 104.) In reviewing the bank's challenge to the award of attorney fees, the appellate court observed that in adding Ralston to the joint account, the bank violated OCGA section 7-1-814, a statute analogous to Probate Code section 5303. "Once the joint account was established in the names of Mr. and Ms. Carson, its terms could be changed only by 'closing the account and reopening it under different terms,' or '[b]y presentation to the [Bank] of a modification agreement in a form satisfactory to the [Bank] and signed by all parties with a present right of withdrawal.' [Citations.] Under OCGA § 7-1-814 a public policy has been established that 'the terms of a multiple-party account, including the designation of those parties who have the right of withdrawal, can be changed *only* by compliance with the requirements of [the statute].' (Emphasis in original.) [Citation.] When Ralston was added, the account was neither closed and reopened, nor was Mr. Carson notified. The Bank's actions could constitute not only a breach of its contractual obligations under the joint account [citation], but also a tortious breach of the public policy imposed under OCGA § 7-1-814 upon creation of the account. [Citations.]" (*Ralston, supra,* 429 S.E.2d at p. 104; see *Rawlins v. Campbell* (1991) 199 Ga.App. 472, 473 [405 S.E.2d 111, 112] [OCGA § 7-1-814 establishes the public policy the terms of a multiple-party account can be changed only by compliance with the statutory requirements].) The appellate court also noted: "Since Mr. Carson claims the Bank improperly changed the terms of the joint account by adding

Ralston without compliance with OCGA § 7-1-814, this is not a case where the Bank is protected from liability for payments made to a proper party." (*Ralston, supra*, 429 S.E.2d at p. 104, fn. 1.)

■ These cases demonstrate that multiparty account statutes limit the liability of financial institutions for withdrawals made by parties to accounts regardless of their beneficial share, but that this protection does not absolve financial institutions of liability when the alleged breach of duty involves the noncompliance with a statute which governs the sole method for modifying the account terms and adding a party. As relevant to the present case, the institution has an obligation to ensure that parties are added to accounts in compliance with section 5303 and that the person withdrawing money is in fact a proper party. Section 5303, like OCGA section 7-1-814, is an expression of sound public policy. (*Rawlins v. Campbell, supra*, 405 S.E.2d at p. 112.)

The reason for requiring written modification of an account as a matter of public policy is obvious when one reviews the facts of the present case. There is uncertain testimony concerning when and if Wrinkle was added to the account shared by Dennis and Jackie. Wrinkle and bank employee Ferguson testified that Dennis agreed to add Wrinkle to the joint account. Dennis denied that he did so. Tri Counties' answer to interrogatories states Ferguson was the party who added Wrinkle to the account. But Ferguson claimed she did not supervise adding Wrinkle to the account and did not know who did so. Only Wrinkle, and not Dennis or Jackie, signed the new account card. The new signature card purports to be signed on the same date that Dennis and Jackie opened their account, July 30, 1996. However, Wrinkle testified that Dennis and Jackie added her to the account after Jackie was diagnosed with cancer in 1997. Ferguson, on the other hand, testified that Wrinkle was added in 1998. The trial court found that the date on the card was incorrect and that Wrinkle was added at a later date. But the court did not address the absence of a valid explanation for why the date on the signature card was falsified, or the relevance of this fact to Dennis's claim he did not agree to add Wrinkle to the account.

Absent the protection of section 5303, Dennis is placed in the untenable position of proving that he did not verbally agree to add his sister-in-law to the account at some unspecified date with some unspecified person. Surely, the Legislature did not intend for section 5201 to deprive account holders of recourse against financial institutions that permit a person to withdraw funds from a multiparty account when the person is not a proper party to the account pursuant to section 5303 and has been added to the account under questionable circumstances.

Thus, the trial court erred in ruling section 5201 rendered section 5303 inapplicable to Dennis's action against Tri Counties. Because there is no evidence that Dennis and Jackie signed a written modification adding Wrinkle to the joint account, and because the terms of the account agreement do not state that a party can be added without the signed consent of the parties, the court also erred in ruling that Tri Counties added Wrinkle to the account in compliance with section 5303.

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion. Tri Counties must reimburse Dennis for his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Blease, J., and Raye, J., concurred.